ORIGINAL

FILED

FEB 0 1 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
    DEPUTY CLERK

1  Richard A. Marker, SBN 126018
   GREEN & MARKER, ATTORNEYS AT LAW
2  1875 Century East, Suite 1880
   Los Angeles, California 90067
3  Telephone:  (310) 201-0464
   Telecopier:  (310) 201-0461
4

5  Attorneys for Cross-Defendants

6  BEN & JERRY'S OF CALIFORNIA, INC.

7

8              IN THE UNITED STATES DISTRICT COURT

9                EASTERN DISTRICT OF CALIFORNIA

10

11 | BEN & JERRY'S FRANCHISING, INC., a    )  Case No.: 07-CV-1210-LEWKJM
   | Vermont Corporation, and BEN & JERRY'S )
12 | HOMEMADE, INC., a Vermont Corporation, )  CROSS-DEFENDANT BEN & JERRY'S OF
   |                                        )  CALIFORNIA, INC.'S MOTION TO
13 |                                        )  DISMISS CROSS-COMPLAINANT'S
   |              Plaintiffs                )  COMPLAINT PURSUANT TO FEDERAL
14 |                                        )  RULE OF CIVIL PROCEDURE 12(b)(1)
   |     vs.                                )
15 |                                        )
16 | MEHRDAD PORGHAVAMI, et al,             )  Action Filed: November 19, 2007
   |                                        )  Hearing Date: March 7, 2008
17 |              Defendants.               )  Hearing Time: 10:00 a.m.
   |                                        )  Courtroom:    TBD (Visiting Judge)
18 |                                        )

19 | MEHRDAD PORGHAVAMI, et al,             )
   |                                        )
20 |              . Cross-Complainant,      )
   |                                        )
21 |     vs.                                )
   |                                        )
22 | BEN & JERRY'S FRANCHISING, INC., A     )
23 | Vermont Corporation, and BEN & JERRY'S )
   | HOMEMADE, INC., a Vermont Corporation, )
24 | and BEN & JERRY'S OF CALIFORNIA,       )
   | INC., a California Corporation, and WONDER)
25 | ICE CREAM, LLC, a California Limited   )
   | Liability Company, and Roes 1 – 20, inclusive,)
26 |                                        )
27 |              Cross-Defendants.         )
   |                                        )
28

                              1

         MOTION TO DISMISS PURSUANT TO 12(b)(1)

1       PLEASE TAKE NOTICE that on March 7, 2008 at 10:00 a.m. or as soon thereafter as

2 the matter may be heard, in an as of yet to be determined department of the above-noted Court,

3 located at 501 I St., Suite 4-200, Sacramento, CA, Cross-Defendant Ben & Jerry's of California,

4 Inc. ("BJCA") will and hereby does move to dismiss Cross-Complainant Porghavami's Cross-

5 Complaint against it on the grounds that the Court lacks jurisdiction pursuant to F.R.C.P.

6 12(b)(1).

7       Porghavami and BJCA entered into two (2) asset purchase agreements for the ice cream

8 stores which are the bases of Plaintiff's complaint against Porghavami, and Porghavami's Cross-

9 Complaint against BJCA. The asset purchase agreements specifically mandate arbitration for

10 any complaints arising from the agreements. As a result, the Court lacks jurisdiction over BJCA.

11       This motion is made pursuant to Rule 12(b)(1), the attached memorandum of points and

12 authorities, the Court file in this matter, and all other evidence as may be presented at the time of

13 oral hearing.

14

15 Dated: January 30, 2008               GREEN & MARKER

16

17                     By:              RICHARD A. MARKER,
                                       Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28

2

MOTION TO DISMISS PURSUANT TO 12(b)(1)

1      ## MEMORANDUM OF POINTS AND AUTHORITIES

2

3                              ## I.    INTRODUCTION

4          On October 31, 2002, Cross-Defendant Ben & Jerry's of California, Inc. ("BJCA')

5   entered into an "Asset Purchase Agreement" with MPA Group, Inc., a California corporation,

6   wherein MPA purchased the assets of the ice cream store located at 2030 Douglas Blvd, Suite

7   18, Roseville, CA ("Roseville Store"). Defendant and Cross-Complainant MEHRDAD

8   PORGHAVAMI ("Porghavami") is the CEO of MPA and signed a personal guarantee

9   guaranteeing the obligations of the APA, specifically the assigned lease. A copy of the Asset

10  Purchase Agreement and the personal guarantee concerning the Roseville store are attached

11  hereto as Exhibit "A."

12         On December 18, 2003, BJCA entered into an "Asset Purchase Agreement" with MPA

13  GROUP, INC., wherein MPA would purchase the assets of the ice cream store owned by BJCA

14  located at 1335 Arden Way, Arden Market Square, Sacramento, CA ("Sacramento Store").

15  Once again, Porghavami signed a personal guarantee of the Asset Purchase Agreement. A copy

16  of the Asset Purchase Agreement and the personal guarantee concerning the Sacramento store

17  are attached hereto as Exhibit "B."

18         On or about June 21, 2007, Plaintiffs brought an action against Porghavami alleging that

19  Mr. Porghavami breached a number of franchise agreements and guarantees with respect to

20  Plaintiff's granting of a franchise license to Porghavami in connection with the above-noted ice

21  cream stores as well as a separate store in Concord, California[1]. Porghavami responded by

22  counterclaiming against all Cross-Defendants, including BJCA.

23         The two (2) aforementioned Asset Purchase Agreements between Cross-Defendant BJCA

24  and Porghavami are nearly identical, and each contains an arbitration provision for all disputes

25

26  [1] For clarity's sake, the store in Concord was originally owned by BJCA as

27  well, but had been sold to another party prior to Porghavami's ownership of

28  the same.

                                             3

                    MOTION TO DISMISS PURSUANT TO 12(b)(1)

1  arising under or relating to said agreement.  The arbitration provision further nominates Los

2  Angeles, California as the site for any such arbitration.  Porghavami has nevertheless named

3  BJCA as a cross-defendant in this matter in direct contravention of those agreements, and refuses

4  to dismiss the action in favor of arbitration.

5                                                    **II.**

6                    **THE COURT LACKS SUBJECT MATTER JURISDICTION TO**

7                      **HEAR PORGHAVAMI'S CLAIMS AGAINST BJCA**

8          Federal Rule of Civil Procedure 12(b)(1) states as follows:

9                   (b) How to Present Defenses. Every defense to a claim for relief

10                  in any pleading must be asserted in the responsive pleading if one

11                  is required. But a party may assert the following defenses by motion:

12                  (1) lack of subject-matter jurisdiction;

13         The clear and unequivocal terms of the Asset Purchase Agreements mandate that the

14  parties arbitrate any issues relating to the Asset Purchase Agreements.  A valid arbitration

15  agreement between parties deprives a Court of subject matter jurisdiction pursuant to F.R.C.P.

16  12(b)(1).  *See, e.g., Bhd. of Maint. of Way Emples. v. Burlington N. Santa Fe R.R.*, (2001) 270

17  F.3d 637 (8th Cir.); *See also, e.g., Thompson v. Nienaber,* (2002) 239 F. Supp 2d. 478 (D. Ct.

18  N.J.).

19         While BJCA does not believe any of Cross-Complainant's allegations against it to be

20  meritorious, the arbitration agreement compels Porghavami to submit the matter to binding

21  arbitration if he wishes to proceed.  The Court is respectfully requested to dismiss this matter as

22  to Cross-Defendant BJCA.

23  //

24  //

25  //

26  //

27  //

28  //

                                                    4

                         MOTION TO DISMISS PURSUANT TO 12(b)(1)

1                                    **III.**

2                              **CONCLUSION**

3          For the foregoing reasons, the Court is requested to enter an order dismissing

4    Porghavami's Cross-Complaint against BJCA on the grounds that it lacks subject matter

5    jurisdiction pursuant to F.R.C.P. 12(b)(1).

6
     Dated: January 30, 2008                          GREEN & MARKER
7

8                                       By:
                                               RICHARD A. MARKER,
9                                              Attorneys for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          5

                      MOTION TO DISMISS PURSUANT TO 12(b)(1)

1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11  BEN & JERRY'S FRANCHISING, INC., a    )   Case No.: 07-CV-1210-LEWKJM
    Vermont Corporation, and BEN & JERRY'S )
12  HOMEMADE, INC., a Vermont Corporation, )  [PROPOSED] ORDER OF CROSS-
13                                          )  DEFENDANT BEN & JERRY'S OF
                           Plaintiffs       )  CALIFORNIA, INC.'S MOTION TO
14                                          )  DISMISS CROSS-COMPLAINANT'S
                                            )  COMPLAINT PURSUANT TO FEDERAL
15         vs.                              )  RULE OF CIVIL PROCEDURE 12(b)(1)
16  MEHRDAD PORGHAVAMI, et al,              )
                                            )  Action Filed: November 19, 2007
17                         Defendants.      )  Hearing Date: March 7, 2008
                                            )  Hearing Time: 10:00 a.m.
18  _____       )
                                            )
19  MEHRDAD PORGHAVAMI, et al,              )
                                            )
20                    Cross-Complainant,    )
                                            )
21         vs.                              )
                                            )
22                                          )
    BEN & JERRY'S FRANCHISING, INC., A      )
23  Vermont Corporation, and BEN & JERRY'S  )
24  HOMEMADE, INC., a Vermont Corporation,  )
    and BEN & JERRY'S OF CALIFORNIA,        )
25  INC., a California Corporation, and WONDER)
    ICE CREAM, LLC, a California Limited    )
26  Liability Company, and Roes 1 – 20, inclusive,)
27                                          )
                       Cross-Defendants.    )
28        .                                 )

                                        6

                     MOTION TO DISMISS PURSUANT TO 12(b)(1)

1      On March 7, 2008, CROSS-DEFENDANT BEN & JERRY'S OF CALIFORNIA,

2  INC.'S Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) came on for a

3  regularly noticed hearing. After reviewing the pleadings of the parties and hearing oral

4  argument, the Court makes the following ruling:

5      GOOD CAUSE HAVING BEEN SHOWN, Plaintiff's action is hereby dismissed

6  pursuant to F.R.C.P. 12(b)(1).

7

8  DATED: March 7, 2008                  _____

9                        DISTRICT COURT JUDGE

**7**

MOTION TO DISMISS PURSUANT TO 12(b)(1)



## ASSET PURCHASE AGREEMENT
## (FOR PURCHASE OF ROSEVILLE "BEN & JERRY'S" LOCATION)

THIS ASSET PURCHASE AGREEMENT ('Agreement") is made and entered
into as of the __ day of October 2002, by and between BEN & JERRY'S OF
CALIFORNIA, INC., a California corporation ("Seller") and MPA GROUP
INC., a California corporation  ("Buyer"). Seller and Buyer are collectively
referred to herein as "the parties."

### RECITALS

A.    Seller is the owner of that certain franchised "Ben & Jerry's" ice cream Shop,
located at 2030 Douglas Road., Roseville, CA (the "Store"). Seller and Buyer
have agreed upon the terms and conditions pursuant to which Buyer shall
purchase and Seller shall sell substantially all of the assets of the Store,
including the franchise agreement, providing for the operation of the Store as
a "Ben & Jerry's Ice Cream Shop" between Seller and BEN & JERRY'S
HOMEMADE, INC., a Vermont corporation ("Ben & Jerry's"). Buyer and
Seller expressly agree and acknowledge that the transfer of the aforesaid
franchise agreements are subject to the consent and approval of Ben & Jerry's.

B.    In addition to the purchase by the Buyer of the Assets of the Stores, Buyer has
agreed to assume, and perform all of the obligations of Seller under and
pursuant to, the leases for the premises in which the Stores are located, dated
as of December 1, 1995.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are
incorporated herein by this reference, and of the mutual covenants and conditions
contained herein, the parties agree as follows:

### 1.    PURCHASE AND SALE OF ASSETS: PURCHASE OF INVENTORY

1.1    Sale and Transfer of Assets.  Subject to all of the terms and conditions of this
Agreement, Seller hereby agrees to sell, convey, transfer, assign and deliver to
Buyer, and Buyer hereby agrees to purchase for Seller, substantially all of the
assets used by the Seller in the operation of the Stores other than inventory,
consisting of those assets described on Exhibit "A" attached hereto and
incorporated herein by this reference, and an assignment of Seller's right and
interest under the leases for the Stores (the "Assets"), free from all liens and
encumbrances of any kind.  Buyer acknowledges and agrees that this
Agreement includes or provides for an assignment of Seller's right to operate
the Stores as a "Ben & Jerry's" franchised operations, pursuant to its franchise
agreements, dated as of _____, 2001, with Ben & Jerry's (the
"Franchise Agreements"), true and correct copies of which are attached
hereto as Exhibit "B".

1

1.2 <u>Seller to Retain</u>. Notwithstanding the foregoing, Seller shall retain all cash on hand, and Buyer shall obtain no interest therein.

1.3 <u>Assumed Liabilities</u>. In connection with the purchase of the Assets, Buyer hereby agrees to assume the following liabilities and obligations of the Stores, and <u>only</u> the following liabilities and obligations (the "Assumed Liabilities"): (i) the lease for the premises in which the Stores are located, dated as of December 1, 1995, (the "Premises Lease"), a true and correct copy of which is attached hereto as **Exhibit "C"**, and (ii) the Franchise Agreement.

1.4 <u>Retained Liabilities</u>. Seller shall remain liable for, and shall discharge on or before the date due, all liabilities and obligations incurred by or on behalf of the Seller or the Store other than the Assumed Liabilities, including but not limited to the following liabilities (the "Retained Liabilities"):

(a) All accounts payable of the Store other than the Assumed Liabilities;

(b) Any and all amounts payable pursuant to the Premises Lease accruing prior to the Closing Date;

(c) Any and all amounts payable pursuant to the Franchise Agreement accruing prior to the Closing Date; and

(d) Any and all wages, vacations, employee benefits, and related payroll taxes with respect to any and all employees of Seller performing services at or in connection with the Store, accrued as of the Closing Date.

1.5 <u>Purchase Price</u>. The purchase price for the Assets shall be the sum of Fifty Thousand Dollars ($ 50,000.00) (the "Purchase Price"), plus the assumption by the Buyer of the Assumed Liabilities.

1.6 <u>Allocation of Purchase Price</u>. The Purchase Price shall be allocated solely to the Assets as set forth on **Exhibit "A"** attached hereto and incorporated herein by this reference, and all parties agree to be bound by this allocation and to use such allocation for all purposes, including tax and reporting purposes. The parties further agree that, at or prior to the Closing Date, the parties will complete and attach to **Exhibit "A"** Form 8594, reflecting the agreed-upon allocation of the Purchase Price, and both parties shall use such form in any and all reporting relating to this transaction.

1.7 <u>Payment of Purchase Price</u>. The Purchase Price shall be Paid as follows:

(a) The Buyer has paid a deposit, prior to the date hereof, in the amount of Fifty Thousand Dollars ($50,000.00), which deposit shall be credited to the Purchase Price at closing;

1.8   <u>Prorations</u>. Prorations shall be made and payment or credit given, as the case may be, as of the Closing Date, with respect to the following items:

    (a) Utility charges for the Stores;

    (b) All state and local real and personal property taxes arising from or in connection with the Assets or the operation of the Stores;

    (c) Rent, common area charges and other occupancy costs imposed pursuant to the Premises Leases; and

    (d) Advertising and other expenditures, other than the purchase of ice cream and other inventory items, required pursuant to the Franchise Agreements.

1.9   <u>Taxes</u>. State and local real and personal property taxes will be prorated as of the Closing Date in accordance with Section 1.8 hereof. Buyer will not be responsible for any business, occupation, withholding or similar tax, to the extent related to any period before the Closing Date. Buyer will be solely responsible for, and shall report and pay in a timely manner, any sales or use taxes arising out of the sale of the Assets to Buyer hereunder. At the option of Seller, Seller may require Buyer to pay such sales or use taxes to Seller at the Closing Date, for remission to the California Board of Equalization.

1.10   <u>Sale and Transfer of Inventory</u>. Seller and Buyer expressly agree that Buyer shall have the right to purchase, at the list price therefor, all inventory of products, foodstuffs, toppings, ice cream, paper goods, and similar consumables present in the Store at the close of business on the day prior to the Closing Date; provided that all such inventory is in good and usable condition. The parties agree that a representative of Seller and a representative of Buyer shall jointly conduct an inventory following close of business on the day prior to the Closing Date. Seller shall provide Buyer with documentation of the list price of all items in inventory, and Buyer shall purchase the same, for list price, at the Closing Date. In the event, following such inventory, Buyer shall determine not to purchase some or all of such inventory, Seller shall have the right, for a period of five (5) business days, to remove any and all inventory items not purchased by Buyer.

1.11   <u>Employment of Seller's Employees</u>. Seller shall give Buyer the opportunity to interview any employees of Seller currently employed at the Stores. Buyer shall have the right, but not the obligation, to offer employment to any employees of Seller who are, as of the Closing Sate, employed at the Stores. With respect to any such employees who accept employment with Buyer, Seller agrees to (i) terminate such employee benefits as of the Closing Date, and (ii) retain all liability for accrued vacations (if any), employee benefits, wages through the Closing Date, and payroll taxes arising form any of the

<div align="center">3</div>

foregoing.  Seller shall pay any such employees all wages through the Closing
Date, and all accrued vacation, on or before the earlier of (i) Seller's next
regular pay period, or (ii) as required pursuant to applicable law.

    1.12  <u>Guarantee of Buyer's Obligations</u>.  Mehrdad Porghavami has agreed to
guarantee all of the obligations of the Buyer hereunder by executing and
delivering at Closing the Guarantee, which Guarantee constituted a material
inducement to Seller to enter into and perform this Agreement.

2.  <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>.  Seller represents
and warrants, except as otherwise stated, as of the date of this Agreement and as
of Closing Date, as follows:

    2.1  <u>Authorization of Agreement</u>.  This Agreement constitutes a valid and legally
binding obligation of Seller, enforceable according to its terms.  The
execution and delivery of this Agreement, the consummation of the
transaction contemplated by this Agreement, and the compliance by Seller
with all of the provisions of this Agreement have been approved by all
necessary corporate action.  The execution and delivery of this Agreement, the
consummation of the transaction contemplated by this Agreement, and the
compliance by Seller with all of the provisions of this Agreement, will not:

        (a)  Violate any provision of any applicable law, rule or regulation of
any governmental body having jurisdiction over the Stores or the
Assets;

        (b)  Conflict with, or result in a default under any of the terms,
conditions, or provisions of, result in the breach of, or accelerate or
permit the acceleration of the performance required by, any note,
bond, mortgage, indenture, license, agreement, or other instrument
or obligation of any nature whatsoever to which the Seller is a
party or by which the Stores or the Assets are bound; or

        (c)  Violate any order, writ, injunction, decree, statute, rule or
regulation applicable to Seller or the Stores or the Assets.

    2.2  <u>Equipment in Good Operating Condition; Title</u>.  All Assets consisting of
equipment or personal property listed on **Exhibit "A"** are sold in AS-IS
condition.  If and to the extent any of such equipment is subject to
manufacturer's warranties, which warranties are assignable, Seller will assign
such warranties to Buyer as of the Closing Date.  Seller has good and
marketable title to the Assets.

    2.3  <u>Payment of Employer Taxes</u>.  Seller has paid or will pay, prior to
delinquency, all unemployment compensation insurance contributions,
disability compensation insurance contributions and state income tax withheld

4

for employee wages, with respect to all employees of Seller performing
services at the store.

2.4   Financial Information.  Seller has previously delivered certain financial
information to the Buyer, consisting primarily of sales and expense statements
for the Stores through December 31, 2001. **Buyer has been offered the
opportunity to examine the books of Seller, including but not limited to
the General Ledger, Cash Disbursements, Cash Receipts, Sales Reports
and Payroll Journals,** Buyer acknowledges and agrees that Seller does not
maintain GAAP financial statements on a "per-store" basis, and that any
financial information provided by Seller regarding the Store will necessarily
exclude items (including but not limited to overhead allocations, payroll taxes
and servicing costs, insurance which are not accounted for on a "per-store"
basis.) Attached hereto as **Schedule 2.4** and incorporated herein by this
reference are copies of all such actual operating results (the "Financial
Information"). Seller hereby warrants and represents that:

   (a)   There are no debts or liabilities of the Stores or relating to the
         Assets, except as set forth in the Financial Information;

   (b)   The sales volume and gross receipts of the Stores reflected in the
         Financial Information are true and correct; and

   (c)   Except as expressly disclosed to Buyer in writing, the Financial
         Information is true and correct in all material respects.

   BUYER EXPRESSLY ACKNOWLEDGES THAT, ALTHOUGH THE
FINANCIAL INFORMATION IS TRUE AND CORRECT, IT SHOULD NOT BE
ASSUMED THAT THE OPERATING RESULTS OF THE STORE IN THE
FUTURE WILL NECESSARILY BE AS REFLECTED IN THE FINANCIAL
INFORMATION. SELLER DOES NOT INTEND THE FINANCIAL
INFORMATION TO BE USED AS A FORECAST OF RESULTS THAT YOU
MAY ACHIEVE AND SELLER IN NO WAY WARRANTS, REPRESENTS,
PROMISES, PREDICTS OR GUARANTEES THAT BUYER WILL ATTAIN
THESE FINANCIAL RESULTS. BUYER'S RESULTS MAY DIFFER. NO
ASSURANCE CAN BE GIVEN THAT THE STORE CAN OR WILL OPERATE
PROFITABLY. SELLER STRONGLY RECOMMENDS THAT BUYER
CONSULT WITH QUALIFIED INDEPENDENT PROFESSIONAL FINANCIAL,
TAX AND LEGAL ADVISORS ABOUT THE FINANCIAL INFORMATION.
BUYER FURTHER ACHNOWLEDGES THAT THE FINANCIAL
INFORMATION INCLUDES THE NAME AND LAST KNOWN ADDRESS OF
EACH PRIOR OWNER OF THE STORE DURING THE PAST THREE (3)
YEARS.

2.5   Broker.  Seller has retained or utilized the services of a broker, finder or
similar representative in connection with this transaction, and the party is

entitled to a commission with respect to this transaction. The commission is to
be paid by the seller.

2.6  Bulk Sales. Seller represents that this transaction does not constitute a "bulk
sale" as defined in Section 6102 (a)(3) of the California Commercial Code.

2.7  Government Permits. Seller has obtained, and maintains in force, all licenses
and permits necessary to operate the Stores, and all such licenses and permits
are currently in good standing, and shall be in good standing as of the Closing
Date. Such licenses and permits are not assignable or transferable, and Buyer
will be responsible for obtaining any necessary licenses and permits to permit
Buyer to operate the Stores following the Closing Date.

3. REPRESENTATIONS AND WARRANTIES OF BUYER. Buyer hereby
represents and warrants and agrees, except as otherwise stated, as of the date of
this Agreement and as of the Closing Date, as follow:

3.1  Authorization of Agreement. This Agreement constitutes a valid and legally
binding obligation of Buyer, enforceable according to its terms. The
Execution and delivery of this Agreement, the consummation of the
transaction contemplated by this Agreement, and the Compliance by Buyer
with all of the provisions of this Agreement have been approved by all
necessary action. The execution and delivery of this agreement, the
consummation of the transaction contemplated by this Agreement, and the
compliance by Buyer with all of the provisions of this Agreement, will not:

(a) Violate any provision of any applicable law, rule or regulation of
and governmental body having jurisdiction over Buyer, the Store
or the Assets;

(b) Conflict with, or result in a default under any of the terms,
conditions, or provisions of, result in the breach of, or accelerate or
permit the acceleration of the performance required by, any note,
bond, mortgage, indenture, license, agreement, or other instrument
or obligation of any nature whatsoever to which Buyer is a party;
or

(c) Violate any order, writ, injunction, decree, statue, rule or
regulation applicable to the Buyer or any of its property or assets.

3.2  Financial Information. Buyer has received the Financial Information attached
as Schedule 2.4, and has carefully reviewed all such Financial Information.
Buyer is familiar with financial statement and financial reporting, including
financial information of the type constituting the Financial Information.
Buyer has been offered the opportunity to examine the books of Seller,

6

including but not limited to the General Ledger, Cash Disbursements,
Cash Receipts, Sales Reports and Payroll Journals

3.3 Inspection of Store and Assets. Buyer has inspected the Stores and the Assets,
and is familiar with the condition thereof. Except as expressly provided in
Section 2, above, Buyer is purchasing all of the Assets "as is, where is," and
there are no warranties, express or implied, with respect to such Assets, other
than the express warranties set forth in Section 2 hereof.

3.4 Review of Leases and Franchise Agreements. Buyer has received and
reviewed copies of (i) the Premises Lease, and (ii) the Franchise Agreement.
Buyer is familiar with all of the terms and conditions of these agreements.

3.5 Knowledge and Experience; Due Diligence. THE PRINCIPAL OF BUYER
HAS SUBSTATIAL EXPERIENCE IN BUSINESS AND FINANCIAL
MATTERS. BUYER HAS PREVIOUSLY OWNED AND OPERATED
SMALL BUSINESSES. BUYER HAS HAD THE OPPORTUNITY TO
RECEIVE AND REVIEW SUCH INFORMATION, INSPECT SUCH
PROPERTIES (INCLUDING BUT NOT LIMITED TO THE STORE
AND THE ASSETS) AND MAKE SUCH INQUIRIES AS BUYER HAS
DEEMED APPROPRIATE. BUYER HAS MADE THE DECISION TO
PURCHASE THE STORES BASED UPON BUYER'S INDEPENDENT
REVIEW AND DUE DILIGENCE, AND BUYER EXPRESSLY
AGREES AND ACKNOWLEDGES THAT THERE ARE NO
PROMISES, REPRESENTATIONS OR WARRANTIES, IMPLIED OR
EXPRESS, OTHER THAN THOSE SPECIFICALLY SET FORTH IN
SECTION 2 HEREOF.

4. CONVENANTS OF SELLER. Seller hereby convenants and agrees that:

4.1 Conduct of Store Prior to the Closing Date. Prior to the Closing Date:

(a) The business of the Stores shall be conducted only in the ordinary course,
and consistent with past practices;

(b) Seller will duly comply with all laws applicable to the Assets and to the
conduct of the business of the Store;

(c) Seller shall not take any action or do any act that would adversely affect
the continuous operation of the Stores.

4.2 After the Closing Date. Following the Closing Date;

(a) Seller will honor any and all "free ice cream cone" coupons, of the sort
previously distributed by Seller, issued by Buyer and presented at any

7

"Ben & Jerry's" ice cream Shop Owned or operated by Seller or its affiliates; and

(b) Seller shall pay or satisfy the Retained Liabilities in accordance with their respective terms, or in accordance with Seller's normal business practices, as applicable.

5.  **CONVENANTS OF BUYER.** Buyer hereby convenants and agrees that:

5.1  Payment of Premise Lease Following the Closing Date. Following the Closing Date, Buyer shall promptly and fully pay and all obligations, including but not limited to rent, percentage rent, common area charges, property taxes and all other such expenses, arising under the Premise Lease Following the Closing Date. In addition, Buyer shall fully perform all non-monetary obligations of Seller arising under the Premises Leases following the Closing Date. Buyer agrees to provide Seller with a true, correct and complete copy of any notice received by Buyer from the lessor alleging, indicating or giving notice of any default by Buyer under the Premises Lease, within three (3) business days following receipt of same form lessor.

5.2  Performance of Franchise Agreement Following the Closing Date. Following the Closing Date, Buyer shall promptly and fully pay and all obligations, and timely and fully perform all other obligations, arising under the franchise Agreement following the Closing Date. Buyer agrees to provide Seller with a true, correct and complete copy of any notice received by Buyer from Ben & Jerry's alleging, indicating or giving notice of any default by Buyer under the Franchise Agreement, within three (3) business day following receipt of same from Ben & Jerry's.

5.3  Honoring Coupons. Buyer will honor any and all "free ice cream cone" coupons, of the sort previously distributed by Seller, issued by Seller at any "Ben & Jerry's" ice cream Shop owned or operated by Seller or its affiliates and presented at the Stores.

5.4  Gross Sales Reports. Buyer is required under the Premises Lease to submit monthly gross sales reports to the Landlord. Buyer agrees to forward a copy of the monthly sales reports to Seller, no later than the date due to the Landlord.

5.5  Right of First Refusal. Buyer expressly agrees and covenants with Seller that, in the event Buyer proposes to transfer, assign or sell the Stores to any other person or entity, Buyer shall give Seller written notice of such proposed transfers, setting forth the terms of such transaction in reasonable detail. Seller shall have the right, for a period of thirty (30) days following the date of such notice, to purchase the Stores on the terms set forth in such notice which right Seller may exercise by written notice to Buyer given within such thirty

(30) day period. In the event Seller fails or refuses to exercise such right of first refusal within such thirty (30) day period, Buyer shall thereafter be free to complete the sale of the Stores to the person and on the terms described in the notice; provided, however, that if Buyer changes the terms of such transaction, or the identity of the purchaser, Buyer shall again provide Seller with a right of first refusal as provided in this Section 5.5. Seller acknowledges and agrees that the rights in this Section 5.5 are subordinate to the rights of first refusal in favor of Ben & Jerry's as set forth in the Franchise Agreement.

6.  **CONDITIONS TO CLOSING**. The obligation of the parties to consummate this Agreement is subject to the satisfaction on or before the Closing Date of the following conditions, unless waived by the party to whose benefit the condition runs:

    6.1  No Material Inaccuracy. There shall be no material inaccuracy in the representations and warranties of each party hereunder. Such representations and warranties shall be true and correct in all material respects as of the Closing Date as though made on and as of that date.

    6.2  Performance of Covenants. Each party shall have performed all obligations required to be performed by and under this Agreement before the Closing Date.

    6.3  Consent of Ben & Jerry's. The written consent of Ben & Jerry's to the assignment to Buyer of the Franchise Agreements shall have been obtained.

    6.4  No Adverse Proceedings. No action or proceeding shall have been instituted or threatened against Buyer, or Seller, that, if successful, could prohibit the consummation, or require substantial rescission, of the transactions contemplated under this Agreement.

7.  **CLOSING**.

    7.1  Time and Place of Closing. The purchase and sale of the Assets of the Store shall be consummated at a closing, to be held at the offices of Ben & Jerry's of California, Inc., 1334 Parkview Ave, Suite 200, Manhattan Beach, CA 90266, at 10 00 a.m. on October _____, 2002, or at such other time and place as the parties may mutually agree (the "Closing Date"), so long as all conditions to closing provided herein have been fully satisfied or have been waived by the party in whose favor such condition runs.

    7.2  Prorations. Not later the ten (10) days following the Closing Date, Seller and Buyer shall jointly prepare a list of those charges and expenses to be prorated as of the Closing Date, together with reasonable supporting documentation sufficient to permit calculation of the prorations.

## 8.   TERMINATION AND WAIVER.

8.1   Grounds for Termination.  This Agreement may be terminated by Buyer or Seller at any time before the Closing Date, upon written notice to the other party, upon the happening of one or more of the following events:

(a)  If, after the date of this Agreement, a material adverse change in Store or the Assets has occurred, or there has been a material loss or damage to any of the Assets to be purchased pursuant to this Agreement, which change, loss, or damage materially affects or impairs the ability of the Buyer to conduct the business of the Stores upon the consummation of this Agreement;

(b)  If any of the representations and warranties made by either party were materially false or were misleading as of the date given or as of the Closing Date, and these false and misleading representations or warranties shall not have been waived by the party giving notice of the termination; or

(c)  If the terms, convenants, or condition of this Agreement to be complied with or to be performed by the other party at or before the Closing Date shall not have been materially complied with or performed and this noncompliance and nonperformance shall not have been waived by the party giving notice of termination.

8.2   Waiver of Conditions.  Any condition required to be fulfilled hereunder may only be waived in writing, and only by the party in favor of whom such condition runs. No waiver of any one condition shall constitute a waiver of any other condition, or of any other occurrence of the same condition.

## 9.   INDEMNIFICATION

9.1   Buyer's Indemnification of Seller.  Buyer hereby agrees to indemnify and hold Seller, and Seller's officers, directors, shareholders, agents, employees, attorneys, affiliates, successors and assigns, harmless from and against any and all claims, demands, losses, causes of action, damages, liabilities, costs or expenses, including, without limitation, reasonable attorneys' fees incurred in connection therewith, in all instances whether resulting from litigation or other legal action, or from settlement, resolution or defense of claims not resulting in such legal action (collectively, "Losses"), sustained or incurred as a result of, arising out of or in connection with (i) and misrepresentation or breach of warranty by Buyer, (ii) any nonfulfillment by Buyer of any covenant, agreement or obligation contained herein or entered into in connection herewith, (iii) any failure or refusal of Buyer to pay or discharge in a timely manner the Assumed Liabilities, (iv) any breach or default of Buyer

under, or any failure of Buyer to fully and timely perform all obligations
arising from , the Premises Lease or the Franchise Agreement following the
Closing Date, (v) any taxes or other liability or obligation attributable to
Buyer for any period after the Closing Date, and any sales or use taxes
allocated to Buyer as provided in Section 1.9 hereof. Buyer expressly agrees
and acknowledges that the rights of Seller hereunder are in addition to, and
not in lieu of, any and all other rights and remedies which Seller may have at
law or in equity.

9.2   Seller's Indemnification of Buyer.  Seller hereby agrees to indemnify and hold
Buyer, and Buyer's officers, directors, shareholders, agents, employees,
attorneys, affiliates, successors and assigns, harmless from and against any
and all Losses sustained or incurred as a result of, arising out of, or in
connection with (i) any misrepresentation or breach of warranty by Seller, (ii)
any nonfulfillment by Seller of any covenant, agreement or obligation
contained herein or entered into in connection herewith, (iii) any failure or
refusal of Seller to pay or discharge in a timely manner any debts or
obligations of the Store other than the Assumed Liabilities, (iv) any failure,
refusal or inability on the part of the Seller to deliver title to the Assets free of
any liens, encumbrances, charges, adverse interests, claims or successor
liability, or (v) any taxes or other liability or obligation attributable to the
Seller for any period before the Closing Date. Seller expressly agrees and
acknowledges that the rights of Buyer hereunder are in addition to, and not in
lieu of, any and all other rights remedies which Buyer have at law or in equity.

## 10.  MISCELLANEOUS.

10.1   Notices.  All notices under this Agreement will be in writing and will be
delivered by personal service, telegram, facsimile or first class mail (postage
prepaid) to such address as may be designated from time to time by the
relevant party, and which will initially be as set forth below. Any notice sent
by first class mail will be deemed to have been given three (3) days after the
date on which it is mailed. All other notices will be deemed given when sent.
No objection may be made to the manner of delivery of any notice actually
received in writing by an authorized agent of a party. Notices will be
addressed as follows or to such other address as the party to whom the same is
directed will have specified in conformity with the foregoing:

(a)  .  If to Buyer:

MPA GROUP INC.
Attn: Mehrdad Porghavami
5025 Hunter Leigh Place
Antelope, CA 95843
Fax: (916) 729-4833   Home
Phone: (916) 729-9425   Fax

11

(b)    If to Seller:

Ben & Jerry's of California, Inc.
1334 Parkview Ave. Suite #200
Manhattan Beach, CA 90266
Fax: (310) 546-1597
Phone: (310) 546-1717

10.2   Governing Law. This Agreement will be governed by and construed in
accordance with the domestic laws of the State of California, without giving
effect to any choice of law or conflict provision or rule (whether of the State
or California or any other jurisdiction) that would cause the application of the
laws of any jurisdiction other that the State of California.

10.3   Remedies Not Exclusive. No remedy conferred by any of the specific
provisions of this Agreement is intended to be exclusive of any other remedy,
and each and every remedy will be cumulative and will be in addition to every
other remedy given hereunder or now of hereafter existing at law or in equity
or by statute or otherwise. The election of any one of more remedies will not
constitute a waiver of the right to pursue other available remedies.

10.4   Headings. The Section and Subsection headings in this Agreement are
inserted only as a matter of conveniences, and in no way define, limit, or
extend or interpret the scope of this Agreement or of any particular Section or
Subsection.

10.5   Severability. The validity, legality or enforceability of the remainder of this
Agreement will not be affected even if one or more of the provisions of this
Agreement will be held to be invalid, illegal or unenforceable in any respect.

10.6   Representation By Counsel. EACH PARTY HERETO HAS BEEN
GIVEN THE OPPORTUNITY TO CONSULT LEGAL COUNSEL OF
SUCH PARTY'S CHOICE. THE PARTIES EACH RESPECTIVELY
REPRESENT AND WARRANT THAT THEY ARE FAMILIAR WITH
ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT,
AND THE EFFECT THEREOF, AND THAT THIS AGREEMENT IS
ENTERED INTO BY THE PARTIES VOLUNTARILY AND
WITHOUR INFLUENCE OR DURESS. BUYER EXPRESSLY
AGREES, ACKNOWLEDGES, REPRESENTS AND WARRANTS
THAT BUYER HAS CAREFULLY REVIEWED AND FULLY
UNDERSTANDS ALL OF THE TERMS AND CONDITIONS OF THIS
AGREEMENT AND THE OTHER AGREEMENTS REFERRED TO
HEREIN.



Initials: Buyer:  Seller: 

10.7 **Good Faith**. All parties hereto expressly covenant to deal with each other in good faith regarding all action, decisions and conduct relating to this Agreement.

10.8 **Binding Effect, Benefits**. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties hereto or their respective successor and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

10.9 **Assignability.** Neither this Agreement nor any of Buyer's right of obligations hereunder shall be assignable by Buyer without the prior written consent of Seller. Seller may assign this Agreement or any of Seller's rights or obligations hereunder, in whole or in part, to any affiliate of Seller, or to any third in connection with the sale of all of substantially all of the assets of Seller.

10.10 **Arbitration**. The parties agree that any and all disputes arising under or relating to this Agreement shall be submitted to binding arbitration before the American Arbitration Association, in accordance with its Commercial Arbitration Rules. The parties further agree that the arbitrator(s) in such arbitration shall have no power of authority to award or assess punitive or exemplary damages. The parties expressly agree and acknowledge that any award rendered in such arbitration shall be final, binding and conclusive, and judgment may be entered in any court of competent jurisdiction upon any such award. Such arbitration shall be held in Los Angeles, California.

10.11 **Attorneys' Fees**. In the event that any party to this Agreement institutes or is made a party to any arbitration, action or proceeding to preserve, to protect or to enforce any right or benefit created by this Agreement, the prevailing party shall be entitled, in addition to any and all relief granted by a court or panel of arbitrators, to an award in such action or proceeding of that sum of money which represents the court costs and attorneys' fees reasonably incurred by the prevailing party therein in filing or otherwise instituting and in prosecuting or otherwise pursuing said arbitration, action or proceeding, and, additionally, the attorneys' fees reasonably incurred by said prevailing party in negotiating any and all matters underlying said action or proceeding and in preparation for instituting said action or proceeding.

10.12 **Entire Agreement**. This Agreement, its exhibits and schedules, and the agreements and documents expressly referred to herein, constitute the entire agreement between the parties hereto with respect to the subject matter hereof

13

and supersede all prior agreements and understandings, oral and written, between the parties hereto with the respect of the subject matter hereof. No representation, warranty, promise, inducement or statement of intention has been made by either party which is not embodied in this Agreement or such other documents, and neither party shall be bound by, or be liable for, any alleged representation, warranty, promise, inducement or statement of intention not embodied herein or therein.

10.13 <u>Other Documents and Acts</u>. Each party hereto agrees to execute (with acknowledgments where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreements set forth herein.

10.14 <u>Survival.</u> All terms, conditions, provisions, covenants, agreements, representations and warranties made herein shall survive the performance by the parties hereto of their obligations hereunder and the termination or expiration of this Agreement.

10.15 <u>Counterparts.</u> This Agreement may be executed simultaneously in two or more Counterparts, each of which shall be seemed an original, but all of which together shall constitute one and the same instrument.

10.16 <u>Joint and Several Liability</u>. If there is more than one party signing this Agreement as "Buyer", the liability of each such person hereunder shall be joint and several.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

"SELLER"

BEN & JERRY'S OF CALIFORNIA, INC.

By: _____
Jay Barr, Vice President

"BUYER"

MPA GROUP, INC.

By: _____
Mehrdad Porghavami, President

14

EXHIBIT E

GUARANTEE OF LEASE

THIS GUARANTEE OF LEASE (this "Guarantee") is made as of November 30, 2002, by and between **MEHRDAD PORGHAVAMI**, (individually "Guarantor"), and **ROCKY RIDGE VENTURE LLC**, a California limited liability company ("Owner").

WHEREAS, Owner and MPA GROUP, INC., ("Tenant") are about to execute a Lease Assignment affecting those certain premises (the "Premises") commonly known as 2030 Douglas Blvd., Space 18, Roseville, California, pursuant to which Owner shall lease the Premises to Tenant;

WHEREAS, Owner would not execute the Lease Assignment or lease the Premises to Tenant if Guarantor would not execute and deliver to Owner this Guarantee;

NOW, THEREFORE, for and in consideration of the execution of the Lease Assignment by Owner and as a material inducement to Owner to execute the Lease Assignment, Guarantor hereby guarantees the prompt and timely payment by Tenant of all rentals and all other sums payable by Tenant under the Lease and the faithful, prompt and timely performance by Tenant of each and every covenant, agreement, term and condition to be performed by Tenant under the Lease. Guarantor also agrees as follows:

1. The provisions of the Lease may be altered, affected, modified, amended or changed in a non-material manner by agreement between Owner and Tenant without the consent of and without notice to Guarantor and that this Guarantee shall thereupon and thereafter guarantee the performance of Tenant's obligations under the Lease as so changed, modified, amended, or altered.

2. Guarantor's obligations under this Guarantee shall not be released, modified or affected in any manner by any failure or delay on the part of Owner to enforce any of its rights or remedies under the Lease, at law or in equity.

3. No notice of default of Tenant under the Lease need be given by Owner to Guarantor, it being specifically agreed that this Guarantee is a continuing Guarantee under which Owner may proceed forthwith and immediately against Guarantor or Tenant, or both, at Owner's option, following any breach or default by Tenant or for the enforcement of any rights which Owner may have against Tenant pursuant to or under the terms of the Lease or at law or in equity. Owner shall have the right to proceed against Guarantor hereunder following any breach or default by Tenant or for the enforcement of any such rights without first proceeding against Tenant and without previous notice to or demand upon either Tenant or Guarantor. Notwithstanding anything contained herein to the contrary, Owner shall use its best efforts to notify Guarantor of a default.

4. Guarantor waives the right to require Owner to: (a) proceed against Tenant; (b) proceed against or exhaust any security that Owner holds from Tenant; or (c) pursue any other remedy in Owner's power. Until all of Tenant's obligations to Owner have been discharged in full, Guarantor shall have no right of subrogation against Tenant. Guarantor waives any right to participate in any security now or later held by Owner. Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notice of protests, notices of dishonor, and notices of acceptance of this Guarantee, and further waives all notices of the existence, creation or incurring of new or additional obligations.

5. Guarantor authorizes Owner, without notice or demand, from time to time in its absolute discretion, and without prejudice to or in any way affecting, limiting, or lessening the liability of the Guarantor hereunder, to: (i) renew, compromise, grant extensions of time or other indulgences, accelerate, modify, discharge, release any part or parties, or otherwise change the time for payment of any rents or other sums due under the Lease, or any of the other obligations of Tenant as provided therein; (ii) take and hold security for the performance of the Lease or this Guarantee, and exchange, enforce, waive and release any such security; and (iii) apply such security and direct the order of manner of sale thereof as Owner in its discretion may reasonably determine.

6. Upon any transfer or sale of the Premises or upon the transfer of the Lease by will or inheritance or otherwise by law, this Guarantee shall pass to and may be enforced by any such transferee.

7. If Tenant is a corporation, it is not necessary for Owner to inquire into the corporate powers of Tenant or of the officers, directors, or agents acting or purporting to act on Tenant's behalf, and any obligation made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

8. If either party is required to take action to enforce or attempt to enforce this Guarantee, whether by action at law or otherwise, the prevailing party shall pay reasonable attorney's fees and all other costs and expenses which may be incurred.

9. This is a continuing Guarantee which shall remain in effect throughout the term of the Lease, including the period of any renewals, extensions, or holding over and with respect to all premises not or hereafter subject to the Lease.

10. Guarantor hereby agrees that the County of Sacramento is the proper jurisdiction for litigation of any matter relating to the Lease or this Guarantee, and further agrees that service mailed to the address of Tenant set forth in the Lease shall be adequate service upon Guarantor for such litigation.

11. The individuals executing this Guarantee on behalf of any corporation, partnership or other entity constituting a Guarantor hereby individually warrant and represent that (i) the execution of this Guarantee by Guarantor has been duly authorized in full compliance with the requirements of the articles of incorporation bylaws, partnership agreement or other organizational documents of Guarantor and in compliance with the requirements of the laws of the state of formation of Guarantor, (ii) such individuals are duly authorized to execute this Guarantee on behalf of Guarantor and (iii) the execution of this Guarantee by Guarantor does not violate any statute, law or governmental order applicable to Guarantor. Upon the request of Owner, Guarantor shall deliver to Owner certified copies of resolutions, consents, bylaws or other documents evidencing the due authorization and execution of this Guarantee.

12. Guarantor shall indemnify, defend and hold Owner harmless from and against any damage, obligation, reasonable cost or expense suffered by Owner resulting from the breach of any of Guarantor's obligations hereunder.

GUARANTOR:

MEHRDAD PORGHAVAMI, individually

**B**

## ASSET PURCHASE AGREEMENT
## (FOR PURCHASE OF SACRAMENTO "BEN & JERRY'S" LOCATION)

THIS ASSET PURCHASE AGREEMENT ('Agreement") is made and entered into as of the _15_ day of December 2003, by and between BEN & JERRY'S OF CALIFORNIA, INC., a California corporation ("Seller") and MPA GROUP INC., a California corporation ("Buyer"). Seller and Buyer are collectively referred to herein as "the parties."

### RECITALS

A.  Seller is the owner of that certain franchised "Ben & Jerry's" ice cream Shop, located at 1735 Arden Way, Sacramento, CA (the "Store"). Seller and Buyer have agreed upon the terms and conditions pursuant to which Buyer shall purchase and Seller shall sell substantially all of the assets of the Store, including the franchise agreement, providing for the operation of the Store as a "Ben & Jerry's Ice Cream Shop" between Seller and BEN & JERRY'S HOMEMADE, INC., a Vermont corporation ("Ben & Jerry's"). Buyer and Seller expressly agree and acknowledge that the transfer of the aforesaid franchise agreements are subject to the consent and approval of Ben & Jerry's.

B.  In addition to the purchase by the Buyer of the Assets of the Stores, Buyer has agreed to assume, and perform all of the obligations of Seller under and pursuant to, the leases for the premises in which the Stores are located, dated as of December 31, 1992.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated herein by this reference, and of the mutual covenants and conditions contained herein, the parties agree as follows:

### 1.  PURCHASE AND SALE OF ASSETS: PURCHASE OF INVENTORY

1.1  Sale and Transfer of Assets.  Subject to all of the terms and conditions of this Agreement, Seller hereby agrees to sell, convey, transfer, assign and deliver to Buyer, and Buyer hereby agrees to purchase for Seller, substantially all of the assets used by the Seller in the operation of the Stores other than inventory, consisting of those assets described on Exhibit "A" attached hereto and incorporated herein by this reference, and an assignment of Seller's right and interest under the leases for the Stores (the "Assets"), free from all liens and encumbrances of any kind.   Buyer acknowledges and agrees that this Agreement includes or provides for an assignment of Seller's right to operate the Stores as a "Ben & Jerry's" franchised operations, pursuant to its franchise agreements, dated as of _____, 2001, with Ben & Jerry's (the "Franchise Agreements"), true and correct copies of which are attached hereto as Exhibit "B".

1

1.2   **Seller to Retain.** Notwithstanding the foregoing, Seller shall retain all cash on
hand, and Buyer shall obtain no interest therein.

1.3   **Assumed Liabilities.** In connection with the purchase of the Assets, Buyer
hereby agrees to assume the following liabilities and obligations of the Stores,
and only the following liabilities and obligations (the "Assumed Liabilities"):
(i) the lease for the premises in which the Stores are located, dated as of
December 31, 1992, (the "Premises Lease"), a true and correct copy of which
is attached hereto as Exhibit "C", and (ii) the Franchise Agreement.

1.4   **Retained Liabilities.** Seller shall remain liable for, and shall discharge on or
before the date due, all liabilities and obligations incurred by or on behalf of
the Seller or the Store other than the Assumed Liabilities, including but not
limited to the following liabilities (the "Retained Liabilities"):

(a) All accounts payable of the Store other than the Assumed Liabilities;

(b) Any and all amounts payable pursuant to the Premises Lease accruing
prior to the Closing Date;

(c) Any and all amounts payable pursuant to the Franchise Agreement
accruing prior to the Closing Date; and

(d) Any and all wages, vacations, employee benefits, and related payroll taxes
with respect to any and all employees of Seller performing services at or
in connection with the Store, accrued as of the Closing Date.

1.5   **Purchase Price.** The purchase price for the Assets shall be the sum of One
Hundred and Twenty Thousand Dollars ($ 120,000.00) (the "Purchase
Price"), plus the assumption by the Buyer of the Assumed Liabilities.

1.6   **Allocation of Purchase Price.** The Purchase Price shall be allocated solely to
the Assets as set forth on Exhibit "A" attached hereto and incorporated herein
by this reference, and all parties agree to be bound by this allocation and to
use such allocation for all purposes, including tax and reporting purposes.
The parties further agree that, at or prior to the Closing Date, the parties will
complete and attach to Exhibit "A" Form 8594, reflecting the agreed-upon
allocation of the Purchase Price, and both parties shall use such form in any
and all reporting relating to this transaction.

1.7   **Payment of Purchase Price.** The Purchase Price shall be Paid as follows:

(a) The Buyer has paid a deposit, prior to the date hereof, in the amount of
Thirty-Five Thousand Dollars ($35,000.00), which deposit shall be
credited to the Purchase Price at closing;

2

(b) Eighty-five thousand Dollars ($85,000.00) to be financed by Seller, amortized over 36 months at 7% interest, with the total outstanding balance due March 1, 2005.

1.8  Prorations. Prorations shall be made and payment or credit given, as the case may be, as of the Closing Date, with respect to the following items:

(a) Utility charges for the Stores;

(b) All state and local real and personal property taxes arising from or in connection with the Assets or the operation of the Stores;

(c) Rent, common area charges and other occupancy costs imposed pursuant to the Premises Leases; and

(d) Advertising and other expenditures, other than the purchase of ice cream and other inventory items, required pursuant to the Franchise Agreements.

1.9  Taxes. State and local real and personal property taxes will be prorated as of the Closing Date in accordance with Section 1.8 hereof. Buyer will not be responsible for any business, occupation, withholding or similar tax, to the extent related to any period before the Closing Date. Buyer will be solely responsible for, and shall report and pay in a timely manner, any sales or use taxes arising out of the sale of the Assets to Buyer hereunder. At the option of Seller, Seller may require Buyer to pay such sales or use taxes to Seller at the Closing Date, for remission to the California Board of Equalization.

1.10  Sale and Transfer of Inventory. Seller and Buyer expressly agree that Buyer shall have the right to purchase, at the list price therefor, all inventory of products, foodstuffs, toppings, ice cream, paper goods, and similar consumables present in the Store at the close of business on the day prior to the Closing Date; provided that all such inventory is in good and usable condition. The parties agree that a representative of Seller and a representative of Buyer shall jointly conduct an inventory following close of business on the day prior to the Closing Date. Seller shall provide Buyer with documentation of the list price of all items in inventory, and Buyer shall purchase the same, for list price, at the Closing Date. In the event, following such inventory, Buyer shall determine not to purchase some or all of such inventory, Seller shall have the right, for a period of five (5) business days, to remove any and all inventory items not purchased by Buyer.

1.11  Employment of Seller's Employees. Seller shall give Buyer the opportunity to interview any employees of Seller currently employed at the Stores. Buyer shall have the right, but not the obligation, to offer employment to any employees of Seller who are, as of the Closing Sate, employed at the Stores.

3

With respect to any such employees who accept employment with Buyer,
Seller agrees to (i) terminate such employee benefits as of the Closing Date,
and (ii) retain all liability for accrued vacations (if any), employee benefits,
wages through the Closing Date, and payroll taxes arising form any of the
foregoing. Seller shall pay any such employees all wages through the Closing
Date, and all accrued vacation, on or before the earlier of (i) Seller's next
regular pay period, or (ii) as required pursuant to applicable law.

1.12  Guarantee of Buyer's Obligations. Mehrdad Porghavami has agreed to
guarantee all of the obligations of the Buyer hereunder by executing and
delivering at Closing the Guarantee, which Guarantee constituted a material
inducement to Seller to enter into and perform this Agreement.

2.  **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents
and warrants, except as otherwise stated, as of the date of this Agreement and as
of Closing Date, as follows:

2.1  Authorization of Agreement. This Agreement constitutes a valid and legally
binding obligation of Seller, enforceable according to its terms. The
execution and delivery of this Agreement, the consummation of the
transaction contemplated by this Agreement, and the compliance by Seller
with all of the provisions of this Agreement have been approved by all
necessary corporate action. The execution and delivery of this Agreement, the
consummation of the transaction contemplated by this Agreement, and the
compliance by Seller with all of the provisions of this Agreement, will not:

   (a)  Violate any provision of any applicable law, rule or regulation of
   any governmental body having jurisdiction over the Stores or the
   Assets;

   (b)  Conflict with, or result in a default under any of the terms,
   conditions, or provisions of, result in the breach of, or accelerate or
   permit the acceleration of the performance required by, any note,
   bond, mortgage, indenture, license, agreement, or other instrument
   or obligation of any nature whatsoever to which the Seller is a
   party or by which the Stores or the Assets are bound; or

   (c)  Violate any order, writ, injunction, decree, statute, rule or
   regulation applicable to Seller or the Stores or the Assets.

2.2  Equipment in Good Operating Condition: Title. All Assets consisting of
equipment or personal property listed on Exhibit "A" are sold in AS-IS
condition. If and to the extent any of such equipment is subject to
manufacturer's warranties, which warranties are assignable, Seller will assign
such warranties to Buyer as of the Closing Date. Seller has good and
marketable title to the Assets.

4

2.3  Payment of Employer Taxes.  Seller has paid or will pay, prior to delinquency, all unemployment compensation insurance contributions, disability compensation insurance contributions and state income tax withheld for employee wages, with respect to all employees of Seller performing services at the store.

2.4  Financial Information.  Seller has previously delivered certain financial information to the Buyer, consisting primarily of sales and expense statements for the Stores through December 31, 2002.  Buyer has been offered the opportunity to examine the books of Seller, including but not limited to the General Ledger, Cash Disbursements, Cash Receipts, Sales Reports and Payroll Journals, Buyer acknowledges and agrees that Seller does not maintain GAAP financial statements on a "per-store" basis, and that any financial information provided by Seller regarding the Store will necessarily exclude items (including but not limited to overhead allocations, payroll taxes and servicing costs, insurance which are not accounted for on a "per-store" basis.)  Attached hereto as Schedule 2.4 and incorporated herein by this reference are copies of all such actual operating results (the "Financial Information").  Seller hereby warrants and represents that:

(a)  There are no debts or liabilities of the Stores or relating to the Assets, except as set forth in the Financial Information;

(b)  The sales volume and gross receipts of the Stores reflected in the Financial Information are true and correct; and

(c)  Except as expressly disclosed to Buyer in writing, the Financial Information is true and correct in all material respects.

BUYER EXPRESSLY ACKNOWLEDGES THAT, ALTHOUGH THE FINANCIAL INFORMATION IS TRUE AND CORRECT, IT SHOULD NOT BE ASSUMED THAT THE OPERATING RESULTS OF THE STORE IN THE FUTURE WILL NECESSARILY BE AS REFLECTED IN THE FINANCIAL INFORMATION. SELLER DOES NOT INTEND THE FINANCIAL INFORMATION TO BE USED AS A FORECAST OF RESULTS THAT YOU MAY ACHIEVE AND SELLER IN NO WAY WARRANTS, REPRESENTS, PROMISES, PREDICTS OR GUARANTEES THAT BUYER WILL ATTAIN THESE FINANCIAL RESULTS. BUYER'S RESULTS MAY DIFFER.  NO ASSURANCE CAN BE GIVEN THAT THE STORE CAN OR WILL OPERATE PROFITABLY.  SELLER STRONGLY RECOMMENDS THAT BUYER CONSULT WITH QUALIFIED INDEPENDENT PROFESSIONAL FINANCIAL, TAX AND LEGAL ADVISORS ABOUT THE FINANCIAL INFORMATION. BUYER FURTHER ACKNOWLEDGES THAT THE FINANCIAL INFORMATION INCLUDES THE NAME AND LAST KNOWN ADDRESS OF

5

**EACH PRIOR OWNER OF THE STORE DURING THE PAST THREE (3) YEARS.**

2.5   <u>Broker</u>. Seller has not retained or utilized the services of a broker, finder or similar representative in connection with this transaction.

2.6   <u>Bulk Sales</u>. Seller represents that this transaction does not constitute a "bulk sale" as defined in Section 6102 (a)(3) of the California Commercial Code.

2.7   <u>Government Permits</u>. Seller has obtained, and maintains in force, all licenses and permits necessary to operate the Stores, and all such licenses and permits are currently in good standing, and shall be in good standing as of the Closing Date. Such licenses and permits are not assignable or transferable, and Buyer will be responsible for obtaining any necessary licenses and permits to permit Buyer to operate the Stores following the Closing Date.

3.   <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>. Buyer hereby represents and warrants and agrees, except as otherwise stated, as of the date of this Agreement and as of the Closing Date, as follow:

3.1   <u>Authorization of Agreement</u>. This Agreement constitutes a valid and legally binding obligation of Buyer, enforceable according to its terms. The Execution and delivery of this Agreement, the consummation of the transaction contemplated by this Agreement, and the Compliance by Buyer with all of the provisions of this Agreement have been approved by all necessary action. The execution and delivery of this agreement, the consummation of the transaction contemplated by this Agreement, and the compliance by Buyer with all of the provisions of this Agreement, will not:

   (a)   Violate any provision of any applicable law, rule or regulation of and governmental body having jurisdiction over Buyer, the Store or the Assets;

   (b)   Conflict with, or result in a default under any of the terms, conditions, or provisions of, result in the breach of, or accelerate or permit the acceleration of the performance required by, any note, bond, mortgage, indenture, license, agreement, or other instrument or obligation of any nature whatsoever to which Buyer is a party; or

   (c)   Violate any order, writ, injunction, decree, statue, rule or regulation applicable to the Buyer or any of its property or assets.

3.2   <u>Financial Information</u>. Buyer has received the Financial Information attached as <u>Schedule 2.4</u>, and has carefully reviewed all such Financial Information. Buyer is familiar with financial statement and financial reporting, including

6

financial information of the type constituting the Financial Information.
Buyer has been offered the opportunity to examine the books of Seller,
including but not limited to the General Ledger, Cash Disbursements,
Cash Receipts, Sales Reports and Payroll Journals

3.3  Inspection of Store and Assets. Buyer has inspected the Stores and the Assets,
and is familiar with the condition thereof. Except as expressly provided in
Section 2, above, Buyer is purchasing all of the Assets "as is, where is," and
there are no warranties, express or implied, with respect to such Assets, other
than the express warranties set forth in Section 2 hereof.

3.4  Review of Leases and Franchise Agreements. Buyer has received and
reviewed copies of (i) the Premises Lease, and (ii) the Franchise Agreement.
Buyer is familiar with all of the terms and conditions of these agreements.

3.5  Knowledge and Experience; Due Diligence. **BUYER HAS SUBSTANTIAL
EXPERIENCE IN BUSINESS AND FINANCIAL MATTERS. BUYER
HAS PREVIOUSLY OWNED AND OPERATED A BEN & JERRY'S
SCOOP SHOP. BUYER HAS HAD THE OPPORTUNITY TO
RECEIVE AND REVIEW SUCH INFORMATION, INSPECT SUCH
PROPERTIES (INCLUDING BUT NOT LIMITED TO THE STORE
AND THE ASSETS) AND MAKE SUCH INQUIRIES AS BUYER HAS
DEEMED APPROPRIATE. BUYER HAS MADE THE DECISION TO
PURCHASE THE STORES BASED UPON BUYER'S INDEPENDENT
REVIEW AND DUE DILIGENCE, AND BUYER EXPRESSLY
AGREES AND ACKNOWLEDGES THAT THERE ARE NO
PROMISES, REPRESENTATIONS OR WARRANTIES, IMPLIED OR
EXPRESS, OTHER THAN THOSE SPECIFICALLY SET FORTH IN
SECTION 2 HEREOF.**

4.  **CONVENANTS OF SELLER.** Seller hereby convenants and agrees that:

4.1  Conduct of Store Prior to the Closing Date. Prior to the Closing Date:

(a)  The business of the Stores shall be conducted only in the ordinary course,
and consistent with past practices;

(b)  Seller will duly comply with all laws applicable to the Assets and to the
conduct of the business of the Store;

(c)  Seller shall not take any action or do any act that would adversely affect
the continuous operation of the Stores.

4.2  After the Closing Date. Following the Closing Date;

7

(a) Seller will honor any and all "free ice cream cone" coupons, of the sort
previously distributed by Seller, issued by Buyer and presented at any
"Ben & Jerry's" ice cream Shop Owned or operated by Seller or its
affiliates; and

(b) Seller shall pay or satisfy the Retained Liabilities in accordance with their
respective terms, or in accordance with Seller's normal business practices,
as applicable.

5.   **CONVENANTS OF BUYER.** Buyer hereby convenants and agrees that:

5.1   Payment of Premise Lease Following the Closing Date. Following the
Closing Date, Buyer shall promptly and fully pay and all obligations,
including but not limited to rent, percentage rent, common area charges,
property taxes and all other such expenses, arising under the Premise Lease
Following the Closing Date. In addition, Buyer shall fully perform all non-
monetary obligations of Seller arising under the Premises Leases following
the Closing Date. Buyer agrees to provide Seller with a true, correct and
complete copy of any notice received by Buyer from the lessor alleging,
indicating or giving notice of any default by Buyer under the Premises Lease,
within three (3) business days following receipt of same form lessor.

5.2   Performance of Franchise Agreement Following the Closing Date. Following
the Closing Date, Buyer shall promptly and fully pay all obligations, and
timely and fully perform all other obligations, arising under the franchise
Agreement following the Closing Date. Buyer agrees to provide Seller with a
true, correct and complete copy of any notice received by Buyer from Ben &
Jerry's alleging, indicating or giving notice of any default by Buyer under the
Franchise Agreement, within three (3) business day following receipt of same
from Ben & Jerry's.

5.3   Honoring Coupons. Buyer will honor any and all "free ice cream cone"
coupons, of the sort previously distributed by Seller, issued by Seller at any
"Ben & Jerry's" ice cream Shop owned or operated by Seller or its affiliates
and presented at the Stores.

5.4   Gross Sales Reports. Buyer is required under the Premises Lease to submit
monthly gross sales reports to the Landlord. Buyer agrees to forward a copy
of the monthly sales reports to Seller, no later than the date due to the
Landlord.

5.5   Right of First Refusal. Buyer expressly agrees and covenants with Seller that,
in the event Buyer proposes to transfer, assign or sell the Stores to any other
person or entity, Buyer shall give Seller written notice of such proposed
transfers, setting forth the terms of such transaction in reasonable detail.
Seller shall have the right, for a period of thirty (30) days following the date of

8

such notice, to purchase the Stores on the terms set forth in such notice which right Seller may exercise by written notice to Buyer given within such thirty (30) day period. In the event Seller fails or refuses to exercise such right of first refusal within such thirty (30) day period, Buyer shall thereafter be free to complete the sale of the Stores to the person and on the terms described in the notice; provided, however, that if Buyer changes the terms of such transaction, or the identity of the purchaser, Buyer shall again provide Seller with a right of first refusal as provided in this Section 5.5. Seller acknowledges and agrees that the rights in this Section 5.5 are subordinate to the rights of first refusal in favor of Ben & Jerry's as set forth in the Franchise Agreement.

6. **CONDITIONS TO CLOSING**. The obligation of the parties to consummate this Agreement is subject to the satisfaction on or before the Closing Date of the following conditions, unless waived by the party to whose benefit the condition runs;

   6.1 No Material Inaccuracy. There shall be no material inaccuracy in the representations and warranties of each party hereunder. Such representations and warranties shall be true and correct in all material respects as of the Closing Date as though made on and as of that date.

   6.2 Performance of Covenants. Each party shall have performed all obligations required to be performed by and under this Agreement before the Closing Date.

   6.3 Consent of Ben & Jerry's. The written consent of Ben & Jerry's to the assignment to Buyer of the Franchise Agreements shall have been obtained.

   6.4 No Adverse Proceedings. No action or proceeding shall have been instituted or threatened against Buyer, or Seller, that, if successful, could prohibit the consummation, or require substantial rescission, of the transactions contemplated under this Agreement.

7. **CLOSING**.

   7.1 Time and Place of Closing. The purchase and sale of the Assets of the Store shall be consummated at a closing, to be held at the offices of Ben & Jerry's of California, Inc., 1332 Parkview Ave, Suite 100, Manhattan Beach, CA 90266, at 10:00 a.m. on December 14 , 2003, or at such other time and place as the parties may mutually agree (the "Closing Date"), so long as all conditions to closing provided herein have been fully satisfied or have been waived by the party in whose favor such condition runs.

   7.2 Prorations. Not later the ten (10) days following the Closing Date, Seller and Buyer shall jointly prepare a list of those charges and expenses to be prorated

9

as of the Closing Date, together with reasonable supporting documentation
sufficient to permit calculation of the prorations.

## 8.   TERMINATION AND WAIVER.

8.1   Grounds for Termination.  This Agreement may be terminated by Buyer or
Seller at any time before the Closing Date, upon written notice to the other
party, upon the happening of one or more of the following events:

(a) If, after the date of this Agreement, a material adverse change in Store or
the Assets has occurred, or there has been a material loss or damage to any
of the Assets to be purchased pursuant to this Agreement, which change,
loss, or damage materially affects or impairs the ability of the Buyer to
conduct the business of the Stores upon the consummation of this
Agreement;

(b) If any of the representations and warranties made by either party were
materially false or were misleading as of the date given or as of the
Closing Date, and these false and misleading representations or warranties
shall not have been waived by the party giving notice of the termination;
or

(c) If the terms, convenants, or condition of this Agreement to be complied
with or to be performed by the other party at or before the Closing Date
shall not have been materially complied with or performed and this
noncompliance and nonperformance shall not have been waived by the
party giving notice of termination.

8.2   Waiver of Conditions.  Any condition required to be fulfilled hereunder may
only be waived in writing, and only by the party in favor of whom such
condition runs.  No waiver of any one condition shall constitute a waiver of
any other condition, or of any other occurrence of the same condition.

## 9.   INDEMNIFICATION

9.1   Buyer's Indemnification of Seller.  Buyer hereby agrees to indemnify and
hold Seller, and Seller's officers, directors, shareholders, agents, employees,
attorneys, affiliates, successors and assigns, harmless from and against any
and all claims, demands, losses, causes of action, damages, liabilities, costs or
expenses, including, without limitation, reasonable attorneys' fees incurred in
connection therewith, in all instances whether resulting from litigation or
other legal action, or from settlement, resolution or defense of claims not
resulting in such legal action (collectively, "Losses"), sustained or incurred as
a result of, arising out of or in connection with (i) and misrepresentation or
breach of warranty by Buyer, (ii) any nonfulfillment by Buyer of any
covenant, agreement or obligation contained herein or entered into in

10

connection herewith, (iii) any failure or refusal of Buyer to pay or discharge in a timely manner the Assumed Liabilities, (iv) any breach or default of Buyer under, or any failure of Buyer to fully and timely perform all obligations arising from , the Premises Lease or the Franchise Agreement following the Closing Date, (v) any taxes or other liability or obligation attributable to Buyer for any period after the Closing Date, and any sales or use taxes allocated to Buyer as provided in Section 1.9 hereof. Buyer expressly agrees and acknowledges that the rights of Seller hereunder are in addition to, and not in lieu of, any and all other rights and remedies which Seller may have at law or in equity.

9.2 Seller's Indemnification of Buyer. Seller hereby agrees to indemnify and hold Buyer, and Buyer's officers, directors, shareholders, agents, employees, attorneys, affiliates, successors and assigns, harmless from and against any and all Losses sustained or incurred as a result of, arising out of, or in connection with (i) any misrepresentation or breach of warranty by Seller, (ii) any nonfulfillment by Seller of any covenant, agreement or obligation contained herein or entered into in connection herewith, (iii) any failure or refusal of Seller to pay or discharge in a timely manner any debts or obligations of the Store other than the Assumed Liabilities, (iv) any failure, refusal or inability on the part of the Seller to deliver title to the Assets free of any liens, encumbrances, charges, adverse interests, claims or successor liability, or (v) any taxes or other liability or obligation attributable to the Seller for any period before the Closing Date. Seller expressly agrees and acknowledges that the rights of Buyer hereunder are in addition to, and not in lieu of, any and all other rights remedies which Buyer have at law or in equity.

**10. MISCELLANEOUS.**

10.1 Notices. All notices under this Agreement will be in writing and will be delivered by personal service, telegram, facsimile or first class mail (postage prepaid) to such address as may be designated from time to time by the relevant party, and which will initially be as set forth below. Any notice sent by first class mail will be deemed to have been given three (3) days after the date on which it is mailed. All other notices will be deemed given when sent. No objection may be made to the manner of delivery of any notice actually received in writing by an authorized agent of a party. Notices will be addressed as follows or to such other address as the party to whom the same is directed will have specified in conformity with the foregoing:

(a) If to Buyer:

MPA GROUP INC.
Attn: Mehrdad Porghavami
5025 Hunter Leigh Place
Antelope, CA 95843

> Fax:  (916) 729-4833
> Phone:  (916) 729-9425
>
> (b)   If to Seller:
>
> Ben & Jerry's of California, Inc.
> 1332 Parkview Ave.  Suite #100
> Manhattan Beach, CA  90266
> Fax:  (310) 546-1597
> Phone:  (310) 546-1717

10.2  Governing Law.  This Agreement will be governed by and construed in
accordance with the domestic laws of the State of California, without giving
effect to any choice of law or conflict provision or rule (whether of the State
or California or any other jurisdiction) that would cause the application of the
laws of any jurisdiction other that the State of California.

10.3  Remedies Not Exclusive.  No remedy conferred by any of the specific
provisions of this Agreement is intended to be exclusive of any other remedy,
and each and every remedy will be cumulative and will be in addition to every
other remedy given hereunder or now of hereafter existing at law or in equity
or by statute or otherwise.  The election of any one of more remedies will not
constitute a waiver of the right to pursue other available remedies.

10.4  Headings.  The Section and Subsection headings in this Agreement are
inserted only as a matter of conveniences, and in no way define, limit, or
extend or interpret the scope of this Agreement or of any particular Section or
Subsection.

10.5  Severability.  The validity, legality or enforceability of the remainder of this
Agreement will not be affected even if one or more of the provisions of this
Agreement will be held to be invalid, illegal or unenforceable in any respect.

10.6  Representation By Counsel.  EACH PARTY HERETO HAS BEEN
GIVEN THE OPPORTUNITY TO CONSULT LEGAL COUNSEL OF
SUCH PARTY'S CHOICE.  THE PARTIES EACH RESPECTIVELY
REPRESENT AND WARRANT THAT THEY ARE FAMILIAR WITH
ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT,
AND THE EFFECT THEREOF, AND THAT THIS AGREEMENT IS
ENTERED INTO BY THE PARTIES VOLUNTARILY AND
WITHOUR INFLUENCE OR DURESS.  BUYER EXPRESSLY
AGREES, ACKNOWLEDGES, REPRESENTS AND WARRANTS
THAT BUYER HAS CAREFULLY REVIEWED AND FULLY
UNDERSTANDS ALL OF THE TERMS AND CONDITIONS OF THIS
AGREEMENT AND THE OTHER AGREEMENTS REFERRED TO
HEREIN.

12

Initials: Buyer:           Seller: 

**10.7** <u>Good Faith</u>. All parties hereto expressly covenant to deal with each other in good faith-regarding all action, decisions and conduct relating to this Agreement.

**10.8** <u>Binding Effect, Benefits</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties hereto or their respective successor and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**10.9** <u>Assignability</u>. Neither this Agreement nor any of Buyer's right of obligations hereunder shall be assignable by Buyer without the prior written consent of Seller. Seller may assign this Agreement or any of Seller's rights or obligations hereunder, in whole or in part, to any affiliate of Seller, or to any third in connection with the sale of all of substantially all of the assets of Seller.

**10.10** <u>Arbitration</u>. The parties agree that any and all disputes arising under or relating to this Agreement shall be submitted to binding arbitration before the American Arbitration Association, in accordance with its Commercial Arbitration Rules. The parties further agree that the arbitrator(s) in such arbitration shall have no power of authority to award or assess punitive or exemplary damages. The parties expressly agree and acknowledge that any award rendered in such arbitration shall be final, binding and conclusive, and judgment may be entered in any court of competent jurisdiction upon any such award. Such arbitration shall be held in Los Angeles, California.

**10.11** <u>Attorneys' Fees</u>. In the event that any party to this Agreement institutes or is made a party to any arbitration, action or proceeding to preserve, to protect or to enforce any right or benefit created by this Agreement, the prevailing party shall be entitled, in addition to any and all relief granted by a court or panel of arbitrators, to an award in such action or proceeding of that sum of money which represents the court costs and attorneys' fees reasonably incurred by the prevailing party therein in filing or otherwise instituting and in prosecuting or otherwise pursuing said arbitration, action or proceeding, and, additionally, the attorneys' fees reasonably incurred by said prevailing party in negotiating any and all matters underlying said action or proceeding and in preparation for instituting said action or proceeding.

**10.12** <u>Entire Agreement</u>. This Agreement, its exhibits and schedules, and the agreements and documents expressly referred to herein, constitute the entire

13

agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral and written, between the parties hereto with the respect of the subject matter hereof. No representation, warranty, promise, inducement or statement of intention has been made by either party which is not embodied in this Agreement or such other documents, and neither party shall be bound by, or be liable for, any alleged representation, warranty, promise, inducement or statement of intention not embodied herein or therein.

10.13 Other Documents and Acts. Each party hereto agrees to execute (with acknowledgments where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreements set forth herein.

10.14 Survival. All terms, conditions, provisions, covenants, agreements, representations and warranties made herein shall survive the performance by the parties hereto of their obligations hereunder and the termination or expiration of this Agreement.

10.15 Counterparts. This Agreement may be executed simultaneously in two or more Counterparts, each of which shall be seemed an original, but all of which together shall constitute one and the same instrument.

10.16 Joint and Several Liability. If there is more than one party signing this Agreement as "Buyer", the liability of each such person hereunder shall be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

"SELLER"

BEN & JERRY'S OF CALIFORNIA, INC.

By: _____
Michael Gale, President

"BUYER"

MPA GROUP, INC.

By: _____
Mehrdad Porghavami, President

14

## PERSONAL GUARANTEE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the undersigned ("Guarantor") hereby irrevocably and unconditionally guarantees to BEN & JERRY'S OF CALIFORNIA, INC., a California corporation ("Beneficiary") the full and timely performance of all obligations of MPA GROUP, INC., a California corporation ("Debtor") under that certain Asset Purchase Agreement, dated as of the _18_ day of December, 2003 (the "Guaranteed Obligation"). Guarantor expressly acknowledges and agrees that this Guarantee is a Guarantee of performance, and not simply of payment. This Guarantee, and all obligations hereunder, shall survive, and shall not be in any manner limited by (i) any defense the Debtor may have to the Guaranteed Obligation, (ii) any invalidation, rejection or disaffirmance of the Guaranteed Obligation, including in any bankruptcy, and (iii) any extension, renewal, modification, amendment or increase of the Guaranteed Obligation. Guarantor hereby expressly waives, to the maximum extent permitted by law, (i) notice, presentment, demand, notice of dishonor, and (ii) any right to require the Beneficiary to proceed first against the Debtor or any other guarantor, or exhaust any other remedies, prior to proceeding under this Guarantee. Guarantor acknowledges that Beneficiary would not have entered into the Guaranteed Obligation with Debtor but for this Guarantee, and that this Guarantee constituted a material inducement to the Beneficiary to enter into the Guaranteed Obligation.

This Guarantee is entered into, and the obligations of Guarantor hereunder are to be performed primarily in, the County of Los Angeles, State of California. This Guarantee shall be construed in accordance with the laws of the State of California. In the event any suit or action is commenced to enforce this Guarantee, the prevailing party in such suit shall be entitled to recover such party's costs and expenses incurred in such suit or action, including attorneys' fees.

This Guarantee, and all obligations of the undersigned hereunder, shall terminate in the event in the event Debtor is able to obtain the release of the Beneficiary from any further obligation or liability under the Premises Lease (as that term is defined in the Guaranteed Obligation).

IN WITNESS WHEREOF, this Guarantee has been executed as of the date first written above.

GUARANTOR

MEHRDAD PORGHAVAMI

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF

I have read the foregoing _____

_____ and know its contents.

**☐ CHECK APPLICABLE PARAGRAPHS**

☐  I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to
those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐  I am ☐ an Officer ☐ a partner _____ ☐ a _____ of _____

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that
reason. ☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are
true. ☐ The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are
stated on information and belief, and as to those matters I believe them to be true.

☐  I am one of the attorneys for _____

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make
this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that
the matters stated in the foregoing document are true.

Executed on _____ , at _____ , California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____                                    _____
Type or Print Name                                                Signature

## PROOF OF SERVICE
1013a (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of <u>Los Angeles</u> _____ , State of California.

I am over the age of 18 and not a party to the within action; my business address is: <u>1875 Century Park East,</u>
<u>Suite 1880, Los Angeles, CA 90067</u>

On, <u>January 30, 2008</u>   I served the foregoing document described as <u>Motion to Dismiss</u>
<u>Pursuant to F.R.C.P. 12(b)1</u>

_____ on <u>Plaintiff</u> _____ in this action

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:
☒ by placing ☐ the original ☒ a true copy thereof enclosed in sealed envelopes addressed as follows:

Mehrdad Porghavami                          Barry M. Heller, Esq.
5025 Hunter Leigh Place                     1775 Wiehle Avenue, Suite 400
Antelope, CA  95843                         Reston, Virginia 20190-5159


☒ **BY MAIL**

☒ *I deposited such envelope in the mail at <u>Los Angeles</u> _____ , California.
The envelope was mailed with postage thereon fully prepaid.

☐ As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.
Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at
_____ California in the ordinary course of business. I am aware that on motion of the
party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of
deposit for mailing in affidavit.

Executed on <u>January 30, 2008</u> _____ , at <u>Los Angeles</u> _____ , California.

☐ **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

Executed on _____ , at _____ , California.

☐ (State)       I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
☒ (Federal)    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was
made.

<u>Sean P. Feeney</u>
Type or Print Name                                         Signature

*BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN
MAIL SLOT, BOX, OR BAG)
**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal
Solutions                Rev. 7/99
& Plus